NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210702-U

NOS. 4-21-0702, 4-21-0704 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.L. and R.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Menard County |
| Petitioner-Appellee, | ) | Nos. 17JA3 |
| v. | ) | 20JA1 |
| Jed L., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Ramon Manuel Escapa, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding the trial court's order terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    Respondent, Jed L., filed an appeal from the trial court's combined order terminating his parental rights to his minor children, M.L. (born September 4, 2017) and R.L. (born January 25, 2020). Each minor was the subject of a separate trial court case. Respondent appealed in each case, raising the same two issues, namely (1) whether the court erred by finding him unfit, and (2) whether the court erred by finding it in the minor's best interest to terminate his parental rights. We consolidated the appeals, and after our review of the record and the parties' briefs, we affirm.

I. BACKGROUND

¶ 3    The minor, M.L., was the subject of Menard County case No. 17-JA-03, docketed

in this court as appellate court case No. 4-21-0704. The minor, R.L., was the subject of Menard County case No. 20-JA-01, docketed in this court as appellate court case No. 4-21-0702.

¶ 4 When each minor was a newborn, the Illinois Department of Children and Family Services (DCFS) took the minor into protective custody. The State filed petitions for adjudication of neglect based upon allegations of anticipatory neglect and the parents' failure to make progress toward the return of the minors in previous cases. DCFS supported these allegations with citations to those other cases, which involved the neglect of these minors' siblings.

¶ 5 M.L. and R.L. are the seventh and eighth child of respondent and his wife, Nicole L., who is not a party to this appeal. Throughout these proceedings, the parents remained married and continued to reside together. In 2016, the parents' rights were terminated in five sibling cases (Menard County case Nos. 13-JA-1, 13-JA-5, 13-JA-6, 13-JA-7, and 13-JA-8). The sixth sibling was adjudicated neglected in November 2016 upon the parents' stipulation. The status of that case (Menard County case No. 14-JA-4) is unclear from the record before us.

¶ 6 On November 2, 2017, the trial court entered an adjudicatory order finding M.L. was a neglected minor under the theory of anticipatory neglect, in that she would be in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2016)) should she be in the care of her parents. On August 29, 2018, the court entered a dispositional order finding the parents unfit, adjudicating M.L. neglected, and making her a ward of the court.

¶ 7 On January 25, 2020, R.L. was born to the surprise of the caseworkers, as the parents had not shared with anyone that they were expecting another child. Four days later, the State filed its petition for adjudication of neglect on anticipatory-neglect grounds similar to the petition relating to M.L.

¶ 8 On March 16, 2021, the State filed a petition to terminate respondent's parental

rights to M.L., alleging he was unfit for (1) failing to make reasonable efforts to correct the conditions that were the basis for the removal of the minor within nine months after adjudication, specifically from June 18, 2019, to March 18, 2020 (750 ILCS 50/1(D)(m)(i) (West 2020)); (2) failing to make reasonable progress toward the return of the minor within nine months after adjudication, specifically from June 18, 2019, to March 18, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2020)); (3) failing to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)); and (4) his inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness, or an intellectual disability, and there existed sufficient justification to believe his inability to discharge parental responsibilities would exceed beyond a reasonable period of time (750 ILCS 50/1(D)(p) (West 2020)).

¶ 9        Also on March 16, 2021, in R.L.'s case, the State filed a combined amended petition for adjudication of wardship and termination of respondent's parental rights. The State alleged R.L. was neglected under an anticipatory-neglect theory for the following four reasons.

¶ 10        First, the State alleged R.L. was neglected in that his environment would be injurious to his welfare if he was in respondent's care based on (1) respondent's failure to make reasonable progress in the five sibling cases, which led to the termination of respondent's parental rights, and (2) respondent's failure to make substantial progress and reasonable efforts toward the goal of return home within 12 months in the sixth sibling case. See 705 ILCS 405/2-3(1)(b) (West 2020).

¶ 11        Second, the State alleged R.L. was neglected because the sixth sibling was adjudicated neglected upon respondent's stipulation that (1) the mother failed to provide the

necessary feeding and other care to one of the five siblings as a newborn, which endangered his safety and well-being; (2) respondent failed to provide the necessary medical care for one of the five siblings by not treating a rash on the minor's genital area and legs from August 2013 to December 2013, endangering her safety and well-being; and (3) respondent admitted he failed to attend medical appointments for the sixth sibling on four separate dates between March 2015 and October 2015. See 705 ILCS 405/2-3(1)(a) (West 2020).

¶ 12 Third, the State alleged R.L. was neglected because his sibling, M.L., was adjudicated neglected on November 2, 2017. See 705 ILCS 405/2-3(1)(a) (West 2020). And fourth, R.L. was neglected because respondent had not parented any of his children since the five older siblings were removed from the home in 2013.

¶ 13 Further, the State alleged it was in the public's and R.L.'s best interests that R.L. be made a ward of the court. It also requested an order terminating respondent's parental rights to R.L. in that respondent (1) has failed to maintain a reasonable degree of interest, concern, or responsibility as to R.L.'s welfare (750 ILCS 50/1(D)(b) (West 2020)) and (2) has an inability to discharge parental responsibilities supported by evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of a mental impairment, mental illness, or intellectual disability, or developmental disability, and there existed sufficient justification to believe the inability to discharge parental responsibilities would exceed beyond a reasonable period of time (750 ILCS 50/1(D)(p) (West 2020)).

¶ 14 Finally, the State alleged it would be in R.L.'s best interest and welfare that respondent's parental rights be terminated and that DCFS be appointed legal guardian with the power to consent to his adoption.

¶ 15 On April 23, 2021, the trial court conducted an adjudicatory hearing in R.L.'s case.

The court heard testimony from three witnesses: (1) Apple Glover, a child protection investigator for DCFS; (2) Melinda McBride, a caseworker for the Center for Youth and Family Solutions (CYFS) on M.L.'s case; and (3) Nicole L., respondent's wife and mother of the minors.

¶ 16 Glover testified she took protective custody of R.L. when he was days' old prior to being discharged from the hospital because he was at-risk due to M.L.'s status of being in-care and due to the termination of respondent's rights in the five sibling cases. Glover also explained that "the parents had not corrected the conditions that initially led to [DCFS] involvement on their other cases and they had been deemed unfit parents," and their fitness had not been restored. At the conclusion of the hearing, the court found R.L. to be a neglected minor. The court noted the parties had waived the 30-day time period in which to conduct a dispositional hearing.

¶ 17 Much of McBride's testimony was regarding the father's noncompliance with the case plan. He had not completed substance abuse treatment, he was discharged unsuccessfully from individual counseling, he was not completing "drug drops," and he was not communicating with the agency.

¶ 18 On July 22, July 23, and August 20, 2021, the trial court conducted a combined fitness hearing on the State's petition to terminate respondent's parental rights. The State called four witnesses. First, psychiatrist Dr. Terry M. Killian testified he performed psychiatric evaluations on each parent in November 2019 for the purpose of assessing their parenting capacity, specifically regarding M.L. He performed subsequent evaluations upon R.L.'s birth. Although Dr. Killian testified in detail regarding his findings, suffice it to say, he diagnosed respondent with a personality disorder due to his inability to acknowledge any wrongdoing and his tendency to blame others. In Dr. Killian's opinion, "the likelihood [was] very low that [respondent would] eventually become fit to regain custody of any of [his] children."

¶ 19    Second, McBride testified she began as the CYFS caseworker on M.L.'s case in August 2019 and continued with R.L.'s case until February 15, 2020. Pursuant to respondent's October 2019 case plan, respondent was to (1) participate in a substance abuse assessment, (2) participate in a domestic violence assessment, (3) attend psychotherapy at the Veterans Administration facility, (4) participate in anger management counseling, (5) maintain adequate and safe housing, (6) maintain a legal source of income, (7) participate in a psychological evaluation, (8) participate in random toxicology screens, (9) attend the minors' medical appointments, (10) visit with the minors, and (11) cooperate and communicate with DCFS and CYFS. Respondent's case plan was rated overall unsatisfactory because, according to McBride, he was not making progress toward the completion of services. Most importantly, respondent had not completed assessments for domestic violence, anger management, or substance abuse.

¶ 20    Third, Shay Herbord, the CYFS caseworker for both minors after McBride, testified he began working on this case in February 2020. He testified as to the case plan covering October 2019 through April 2020. Respondent's tasks continued from the last case plan. According to Herbord, respondent was resistant to services and did not understand the need for them. He was not willing to cooperate with the caseworker individually or the agency as a whole. The case plan was rated overall unsatisfactory due to respondent's lack of cooperation and lack of progress.

¶ 21    Finally, Leiann Keller, the clinical supervisor at CYFS, testified she began therapy with respondent in January 2020. Respondent was not successful in the therapy sessions, as he failed to hold himself accountable as to why his children were in DCFS care. Keller closed respondent's case on April 1, 2021, because he "reached maximum benefits." He was unsuccessfully discharged for not making substantial progress for a two-year period. Keller said the COVID-19 shut down had no effect on respondent's unsuccessful discharge, as they were still

meeting over the telephone. The State rested.

¶ 22    Respondent testified he had attended all counseling sessions requested of the agency and had participated to a significant degree in those sessions. He explained that COVID-19 prevented his participation in the random drug screens. He testified he receives disability income from the military. In his opinion, he has maintained a safe and appropriate home for the minors.

¶ 23    On September 20, 2021, the trial court entered a written order, finding respondent unfit as alleged in the State's petition to terminate in both cases with one exception. The court found the State had not sufficiently proved respondent was unfit based on his inability to discharge parental responsibilities based on a mental disability in R.L.'s case.

¶ 24    On October 1, 2021, the trial court conducted a combined best-interest hearing. Herbord testified M.L., then four years' old, had resided in the same foster home since her birth in September 2017. Her foster parents were willing to provide her permanency through adoption. This home has provided M.L. with her basic needs and is a clean, safe, and loving environment. M.L. is bonded with her foster parents, calling them "mom" and "dad." There are two biological boys in the home, who consider M.L. their little sister. M.L. is also very bonded to the two family dogs. According to Herbord, it appeared M.L. felt secure and loved in the home.

¶ 25    As for R.L., Herbord testified he had been initially placed with his foster mother's mother for approximately 18 months. However, during that time, R.L.'s current foster parents were considered "collateral caregivers," meaning they were involved in R.L.'s care. Also in the home were two of R.L.'s biological brothers, who had been adopted by the original foster parents. Due to the age of the original foster parents and the stress that accompanied the adoption of two boys, it seemed better for all concerned to have the current foster parents care for R.L. He was the only child in their home. The current foster parents were willing to provide R.L. with permanency

through adoption. Herbord said R.L. was doing well in his current foster placement.

¶ 26        R.L.'s foster mother testified that R.L. has been with her and her husband since June 4, 2021, but she has known R.L. since he was placed with her mother upon birth. R.L. sees two of his biological brothers daily since her mother keeps R.L. during the day while the foster mother is working. R.L. sees M.L. weekly, as she is living with the foster mother's sister and brother-in-law. R.L. refers to the foster mother as "momma" and her husband as "dada." R.L. was currently engaged in speech therapy and would begin developmental therapy soon. She said she and her husband were "[a]bsolutely" willing to adopt R.L. They recently purchased a four-bedroom home in Petersburg, in which R.L. will have his own room. They are expecting a baby in February and have been preparing R.L. for the new addition.

¶ 27        M.L.'s foster father testified he and his wife live in Springfield with his two stepsons, ages 13 and 15, and M.L., age 4. M.L. attends daycare at her foster mother's workplace. M.L. visits with her biological brothers generally every weekend when the families visit the foster mother's parents. M.L. refers to her foster parents as "mommy" and "daddy." She is bonded to her foster family and the two pet dogs. The foster father said he and his wife want to adopt M.L. because she is "basically like [their] daughter. She fits right in perfectly, and even her foster brothers refer to her as their sister."

¶ 28        At the close of evidence, the trial court reminded the parties of the following:

"[W]e are arguing in regards to [M.L.], best interest. We completed the fitness portion. We're now on the best interest. In regards to [R.L.], it becomes a little more complicated because we're still at disposition. This is one continued dispositional hearing. The court has previously ruled on [s]ection 2-21(5) [(705 ILCS 405/2-21(5) (West 2020))], the first three parts of that section, in the order which

was entered on September 20[, 2021].

> So, now, the issues would be in [s]ection [four] [(705 ILCS 405/2-21(5)(iv) (West 2020))] in regards to [R.L.], plus all the additional findings at the dispositional. Just so everybody's clear procedurally where we're at."

¶ 29 After considering the best-interest report, the testimony presented, the arguments of counsel, and the statutory best-interest factors, the trial court, in a written order dated November 2, 2021, determined it was in M.L.'s and R.L.'s best interests to terminate respondent's parental rights.

¶ 30 This appeal followed.

¶ 31                                  II. ANALYSIS

¶ 32 On appeal, respondent asserts the trial court's fitness and best-interest findings were against the manifest weight of the evidence. We disagree.

¶ 33 The Juvenile Court Act of 1987 (Juvenile Court Act) sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq.* (West 2020). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). In this appeal, respondent appears to challenge both of the trial court's findings.

¶ 34 We will not disturb a trial court's finding with respect to parental unfitness unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A

decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 35                              A. Fitness Determination as to M.L.

¶ 36        In the trial court's written September 20, 2021, order, respondent was found unfit on four grounds related to M.L.: (1) he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor during a specified nine-month period following the adjudication of neglect, namely between June 18, 2019, and March 18, 2020 (750 ILCS 50/1(D)(m)(i) (West 2020)); (2) he failed to make reasonable progress toward the return of the minor during the same specified nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)); (3) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)); and (4) he has the inability to discharge parental responsibilities, supported by competent evidence of a mental disability and such disability would extend beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2020)). Only one ground, if properly proven, is sufficient to support the trial court's finding of parental unfitness. See *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 37        In his brief, respondent does not make any particular argument regarding any of the grounds of fitness as they relate to M.L. In fact, he does not mention the trial court's findings related to M.L. at all. The best we can surmise from his brief is that he claims (1) attending 13 of 26 domestic-violence counseling appointments, (2) providing urine samples "to the best of his ability," and (3) not having appropriate parents during his childhood were sufficient to demonstrate that the court's fitness findings were against the manifest weight of the evidence. Further, respondent claims the COVID-19 pandemic prevented him from making any progress toward his goals, stating he "was ultimately cut off from services and the ability to bond with his child[.]" He

does not state which child.

¶ 38    The State notes the "multiple deficiencies" in respondent's brief related to M.L.'s case. It characterizes respondent's argument as "non[ ]existent." We agree.

¶ 39    This court's review of the record makes clear respondent failed to make any progress or reasonable efforts toward successful completion of his tasks. Although he may have attended some counseling sessions, as he asserted in his brief, the various service providers all held the same opinion—respondent was not engaged in and did not actively participate in those sessions so as to demonstrate any forward progress toward the capability of parenting the minors. Further, assuming respondent's pandemic argument relates to M.L., we find it meritless. The State alleged respondent failed to demonstrate parental fitness during the nine-month period of June 18, 2019, to March 18, 2020, before the pandemic affected the operation of services.

¶ 40    For the above reasons, we determine the trial court's order finding respondent unfit to parent M.L. was not against the manifest weight of the evidence.

¶ 41                    B. Fitness Determination as to R.L.

¶ 42    In the trial court's written September 20, 2021, order, respondent was found unfit on one ground related to R.L.: he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)).

¶ 43    As to this fitness finding, respondent claims the State improperly sought termination of his parental rights to R.L. without first conducting an adjudicatory or dispositional hearing. Although he acknowledges the expedited procedure set forth in section 2-21(5) of the Juvenile Court Act (705 ILCS 405/2-21(5) (West 2020)), he asserts the absence of an adjudicatory and dispositional hearing violated his due process rights because (1) he was denied the opportunity to be heard and (2) he was not afforded "additional time to demonstrate progress." Therefore, he

claims, "there is insufficient information to determine whether [respondent] maintained a reasonable degree of interest, concern, or responsibility as to the child's welfare due to the lack of a service plan, adjudicatory hearing and report, and dispositional hearing and report." He claims termination of his parental rights "at this stage is premature."

¶ 44 We note respondent claims the trial court's fitness finding on the remaining alleged ground related to his inability to discharge parental responsibilities based on his mental health was "misleading" because access to providers and treatment was limited by the pandemic. However, according to the court's order, it did not find respondent unfit on this ground.

¶ 45 We further note the trial court indeed conducted an adjudicatory hearing on April 23, 2021, where the court heard evidence from two State's witnesses, Glover and McBride. Respondent appeared personally and through counsel at this hearing. Respondent's counsel cross-examined the State's witnesses, though he did not present any evidence on respondent's behalf. The dispositional hearing occurred simultaneously with the best-interest hearing on October 1, 2021. Again, respondent appeared personally and through counsel. Respondent's counsel cross-examined the witnesses and advised the court respondent would not present any evidence. The court made it clear to the parties that the hearing was a best-interest hearing with regard to M.L. and a dispositional hearing pursuant to section 2-21(5) of the Juvenile Court Act with regard to R.L. See 705 ILCS 405/2-21(5) (West 2020).

¶ 46 Based on this record, we find respondent's arguments challenging the trial court's fitness determination as it relates to the minor R.L. wholly inaccurate, inadequate, and without merit. Accordingly, we find the court's order finding respondent unfit was not against the manifest weight of the evidence.

¶ 47 C. Best-Interest Determination for M.L. and R.L.

¶ 48       Respondent also argues the trial court erred in determining termination of his parental rights was in the minors' best interests. We will not reverse a best-interest determination unless it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 49       Once a trial court has determined a parent is "unfit," it must next determine whether termination of parental rights is in the minor's best interest. See 705 ILCS 405/2-29(2) (West 2020). At the best-interest stage, the focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *D.T.*, 212 Ill. 2d at 364. Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) sets forth the best-interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best-interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child.

¶ 50       Here, the trial court's best-interest determination was not against the manifest weight of the evidence. According to the testimony at the best-interest hearing, the minors are thriving in their respective foster homes and have the best opportunity in those homes to live in a safe, secure, and loving environment. Although the minors reside in separate homes, the testimony of the foster parents indicated the minors will be able to remain in close contact with each other.

The respective foster families are related to each other and to the family who adopted the minors' two biological brothers. Not only did the testimony and other evidence suggest the minors were well-bonded and emotionally healthy in their respective homes, but they have the opportunity to achieve permanence through adoption while maintaining a connection with each other and their siblings. Accordingly, we cannot say the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 51                                    III. CONCLUSION

¶ 52            For the foregoing reasons, we affirm the trial court's judgment.

¶ 53            Affirmed.